# Exhibit A

EFILED IN OFFICE
CLERK OF THE GEORGIA
STATE-WIDE BUSINESS COURT
**21-GSBC-0040**
JUDGE WALTER W. DAVIS
OCT 14, 2021 05:23 PM

Angie T. Davis, Clerk of Court
Georgia State-wide Business Court

IN THE GEORGIA
STATE-WIDE BUSINESS COURT

---------------------------------------------------------X

VARIOUS INSURERS, REINSURERS AND
RETROCESSIONAIRES SUBSCRIBING TO
POLICY NUMBERS 106/IN/230/0/0, 28807G19,
B080130181G19, B080131297G19,
B080127577G19, B080130231G19,
B080130291G19, B080130328G19,
B080128807G19 and B080130331G19 DBD, as
subrogees of SHARIKET
KAHRABA HADJRET EN NOUSS,

**Civil Action File No.:**

**JURY TRIAL DEMANDED**

Plaintifs,

-against-

GENERAL ELECTRIC INTERNATIONAL,
INC., GENERAL ELECTRIC COMPANY, GE
POWER SERVICES ENGINEERING, GE
POWER, and VARIOUS JOHN DOE
CORPORATIONS,

Defendants.

## COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, STRICT PRODUCTS LIABILITY, BREACH OF WARRANTY, FRAUD AND VIOLATIONS OF THE ALGERIAN CIVIL CODE

**COME NOW** Plaintiffs, which are the insurers, reinsurers and retrocessionaires identified above by reference to various policy numbers (collectively, "Plaintiffs"), by and through their attorneys, Kennedys CMK LLP and Fields Howell LLP, as and for their Complaint against the defendants, General Electric International, Inc. ("GE International"), General Electric Company ("GE

Company"), GE PowerServices Engineering ("GE Power Engineering"), GE Power, and various John Doe Corporations (collectively, "Defendants"), allege upon information and belief as follows:

## **INTRODUCTION**

1.      By way of this Complaint, Plaintiffs seek to recover from the Defendants for the significant damages they suffered in connection with an October 14, 2019 incident, which occurred at the Hadjret En Nouss Power Plant located in Tipaza, Algeria (the "Power Plant"). On that date, a GE 9371 Frame FB gas turbine Stage 1 Blade designed, manufactured, installed, and serviced by the Defendants became detached, or "liberated," from its housing in a power train at the Power Plant while rotating at 3,000 revolutions per minute.  This liberation resulted in significant damages to, *inter alia*, the power train that housed the turbine blade, as well as the other components contained within the power train (the "Incident").

2.      As a result of the Incident, Shariket Kahraba Hadjret En Nouss ("SKH")—the owner of the Power Plant—has sustained tens of millions of dollars in business interruption losses and property damage.  SKH has retained partial indemnification for said losses from its direct insurer, which has in turn been partially reimbursed by its reinsurers and retrocessionaires for sums it paid arising from the Incident.

2

3.    Plaintiffs (as SKH's subrogees) now seek reimbursement from the Defendants for losses they have incurred in connection with the Incident that were wrongfully, directly, and proximately caused by the Defendants.  Defendants (and other parties who will be identified through discovery) held themselves out to SKH to be capable of the safe and secure design, manufacture, installation, and service of a sophisticated piece of commercial equipment—*i.e.*, the gas turbine blade that ultimately malfunctioned—and Defendants clearly failed in this regard.

4.    Defendants were well aware of their shortcomings.  As discovery in this action will further demonstrate, other turbine blades that had been installed both at the Power Plant itself, and other similar facilities across the world, suffered systematic and routine failures virtually identical to those that resulted in the Incident.  To that end, Plaintiffs are currently aware of no less than *four* turbine blade failures that occurred from 2015 to the present at the Power Plant, and other facilities located in Turkey, Poland, and China.

5.    In light of their clear awareness of the danger that the turbine blades posed to the property and business operations of their end-user clients, Defendants could have, and should have, undertaken meaningful remedial efforts to prevent the Incident from occurring.

6.      Defendants did no such thing.  Instead, after each turbine blade failure, Defendants would simply issue technical letters recommending that the turbine blades be replaced after a lower and lower amount of total hour usage.

7.      For instance, it was initially recommended that the turbine blades be  replaced after 25,000 hours of operation.  In 2015 however, a turbine blade became liberated in one of the power trains at the Power Plant, and thereafter, Defendants lowered the recommended usage to 16,000 hours of operations.  As liberation events continued to occur, the total hour usage was lowered to 12,000, and then subsequently to 9,000.

8.      After continuously lowering the bar for their own product for years, Defendants were unquestionably aware that the turbine blades were simply unsuitable for their clients' needs and that there was a very real risk that they would cause further significant loss and damage to the end-users.

9.      Defendants could have intervened earlier and replaced the turbine blade that ultimately became liberated.  Instead, in a transparent and self-serving effort to cut corners and costs, Defendants permitted the turbine blade at issue to  be operated for 9,985 hours before scheduling it for replacement (which, notably, was after the point of failure in prior liberation events).

10.      Unsurprisingly, Defendants' efforts were too little too late—on the date the replacement of the turbine blade was scheduled to be performed, the blade

became liberated, resulting in significant property damages to the surrounding components, and in significant business income losses to SKH.

11.     Plaintiffs now seek recovery (as SKH's subrogees) from Defendants, the responsible parties who are liable for and legally obligated to pay for the damages Plaintiffs sustained.

## **VENUE AND JURISDICTION**

12.     Defendants are subject to jurisdiction in this Court inasmuch as they are either residents of Georgia, or non-residents that either transact business in Georgia or who have committed tortious acts in Georgia pursuant to O.C.G.A. § 9-10-91(1)-(3).

13.      Jurisdiction is proper in this Court pursuant to OCGA §15-5A-3 inasmuch as this is a lawsuit alleging, *inter alia*, tort contract claims amongst entities relating to their business, and damages are alleged in excess of all jurisdictional thresholds set forth therein.

14.     Venue is proper in Fulton County pursuant to O.C.G.A. § 15-5A-2(e)(1) and § 9-10-93 because a substantial part of the business at issue, as well as the relevant tortious acts, are believed to have occurred in Atlanta, Georgia.

15.     At all times hereinafter mentioned, Plaintiffs were the insurers, reinsurers and retrocessionaires (including but not limited to lead reinsurer Zurich Insurance Plc UK Branch, a foreign corporation incorporated and holding a

principal place of business in Dublin, Republic of Ireland) subscribing to various insurance policies under which payments were made in connection with the Incident; to wit, policy numbers 106/IN/230/0/0, 28807G19, B080130181G19, B080131297G19, B080127577G19, B080130231G19, B080130291G19, B080130328G19, B080128807G19 and B080130331G19 DBD.

16.    Upon information and belief, at all times hereinafter mentioned, GE International was, and still is, a corporation organized under the laws of the state of Delaware, with a principal place of business in Georgia.

17.    Upon information and belief, at all times hereinafter mentioned, GE International purposefully availed itself of the benefits of conducting business in the state of Georgia and had such continuous and systematic contacts with Georgia that would render it at home in that state for the purposes of general jurisdiction.

18.    Upon information and belief, at all times hereinafter mentioned, GE International maintained sufficient minimum contacts with the state of Georgia, out of which the claims at issue in this action arise, that would subject GE International to specific jurisdiction in Georgia.

19.    Among other things, a Services Contract that GE International entered into with SNC-Lavalin Constructeurs International Inc. ("SNC"), the operator of the Power Plant, with respect to the maintenance of the turbine blades at issue states that GE International is "incorporated under the law of the State of

Delaware, USA, having its principal place of business at 4200 Wildwood Parkway, Atlanta, Georgia."

20.   Additionally, the same address for GE International (4200 Wildwood Parkway, Atlanta, Georgia) appears on a February 12, 2020, purchase order proposal form issued to SNC in connection with services to be provided by GE International at the Power Plant.

21.   This Court may fairly exercise general or specific jurisdiction over GE International with respect to this action.

22.   Upon information and belief, at all times hereinafter mentioned, GE Company was, and still is, a corporation organized under the laws of the state of New York, with a principal place of business in Massachusetts.

23.   Upon information and belief, at all times hereinafter mentioned, GE Company purposefully availed itself of the benefits of conducting business in the state of Georgia and had such continuous and systematic contacts with Georgia that would render it at home in that state for the purposes of general jurisdiction.

24.   Upon information and belief, at all times hereinafter mentioned, GE Company maintained sufficient minimum contacts with the state of Georgia, out of which the claims at issue in this action arise, that would subject GE Company to specific jurisdiction in Georgia.

25.    Among other things, upon information and belief, GE Company is the parent corporation of GE International.

26.    Upon information and belief, GE Company was itself directly involved with the design, manufacture, installation, and servicing of the turbine blades at the Power Plant, or alternatively, it directed, supervised, and/or controlled GE International in the design, manufacture, installation, and servicing of the turbine blades at the Power Plant.

27.    Upon information and belief, all relevant operations relating to the design, manufacture, installation, and servicing of the turbine blades took place in Georgia.

28.    This Court may fairly exercise general or specific jurisdiction over GE International with respect to this action.

29.    Upon information and belief, at all times hereinafter mentioned, GE Power Engineering was, and still is, a division of either GE International and/or GE Company.

30.    Upon information and belief, at all times hereinafter mentioned, GE Power Engineering purposefully availed itself of the benefits of conducting business in the state of Georgia and had such continuous and systematic contacts with Georgia that would render it at home in that state for the purposes of general jurisdiction.

31.    Upon information and belief, at all times hereinafter mentioned, GE Power Engineering maintained sufficient minimum contacts with the state of Georgia, out of which the claims at issue in this action arise, that would subject GE Power Engineering to specific jurisdiction in Georgia.

32.    Among other things, GE Power Engineering issued technical letters relating to the turbine blades that continuously recommended lower and lower amounts of total hours of usage.

33.    Upon information and belief, all relevant operations relating to the design, manufacture, installation, and servicing of the turbine blades took place in Georgia.

34.    This Court may fairly exercise general or specific jurisdiction over GE Power Engineering with respect to this action.

35.    Upon information and belief, at all times hereinafter mentioned, GE Power was, and still is, a division of either GE International and/or GE Company.

36.    Upon information and belief, at all times hereinafter mentioned, GE Power purposefully availed itself of the benefits of conducting business in the state of Georgia and had such continuous and systematic contacts with Georgia that would render it at home in that state for the purposes of general jurisdiction.

37.    Upon information and belief, at all times hereinafter mentioned, GE Power maintained sufficient minimum contacts with the state of Georgia, out of

which the claims at issue in this action arise, that would subject GE Power to specific jurisdiction in Georgia.

38.   Among other things, GE Power Engineering issued technical letters relating to the turbine blades that continuously recommended lower and lower amounts of total hours of usage.

39.   This Court may fairly exercise general or specific jurisdiction over GE Power Engineering with respect to this action.

40.   Upon information and belief, at all times hereinafter mentioned, various John Doe Corporations are the specific subsidiaries, affiliate entities, and/or divisions of International and/or GE Company that were involved in the design, manufacture, installation and servicing of the turbine blades that are at issue in this litigation.

41.   It is believed that all such entities are, for purposes of subject matter jurisdiction, citizens of one or more states of the United States, and that none of the entities are citizens of foreign countries, such that diversity in this action would be impaired.

42.   It is anticipated that preliminary discovery in this action will reveal the identity of various John Doe Corporations and once such discovery is taken, this Complaint will be promptly amended to remove such fictitious names from the caption, and to replace them with the true identities of those parties.

# FACTUAL
# BACKGROUND

## I.    The Power Plant

43.    At all relevant times hereinafter mentioned, SKH was the owner of the Power Plant.

44.    The Power Plant had been constructed by SNC.

45.    Pursuant to a contract with SKH, SNC also served as the operator of the Power Plant.

46.    The Power Plant consisted of three power trains, each of which are owned by SKH (referred to herein collectively as the "Power Trains" and individually as "Power Train 1," "Power Train 2," and "Power Train 3").

47.    The Power Trains were fitted with GE 9371 Frame FB gas turbines.

48.    In gas turbines such as these, air passes through rows of increasingly large blades at extremely high temperatures, and energy is produced as the turbine spins.

49.    Each row of blades is referred to as a "stage" or a "section."

50.    The first row of turbine blades, known as "Section 1 Blades" or "Stage 1 Blades" (referred to herein as "S1Bs") are where companies like the Defendants and their competitors tend to make the most rapid advances, as energy efficiency and output can be greatly increased by pushing the capacities of the S1Bs higher and higher.

51.     The S1Bs produced by Defendants were initially introduced on the market prior to 2009. These were later referred to as GENX blades.

52.     Over time, as issues began to arise with the S1Bs and defects became apparent (see infra), Defendants introduced subsequent generational models known as the GEN0, GEN1, and GEN2 S1Bs.

53.     The power trains at the Power Plant utilized GEN1 S1Bs and GEN2 S1Bs.

54.     Power Train 3—which is the focus of this litigation—was equipped with GEN1 S1Bs.

55.     Upon information and belief, both the turbines themselves, and the S1Bs, were designed, manufactured, and installed at the Power Plant by GE International, and/or the other Defendants.

56.     Furthermore, pursuant to a Services Contract entered into by and between SNC and GE International in or around September 2006, GE International agreed to perform maintenance services at the Power Plant—which included, *inter alia*, the "periodic inspection, testing, repair and/or replacement of components of the [Power Trains]."

57.     Thus, GE International, and the other Defendants, were solely responsible for the safe and competent design, manufacture, installation, and

servicing of the Power Trains and their components, including the gas turbines and S1Bs.

## II.   Gas Turbine And S1B Issues Arising Prior To The Incident

58.   Beginning in 2015, issues with the gas turbines and S1Bs began to arise that would ultimately foreshadow the Incident.

59.   In that regard, numerous liberation events occurred all over the world involving Defendants' S1Bs.

60.   Liberation events are serious problems for customers and service providers alike. In general, planned, turbine blade replacement is a time- and labor-intensive process. The gas turbine must be turned off and, after cooling down, the large casing must be opened. Highly specialized tools and highly trained laborers are necessary.  Under ideal circumstances, with readily available spare parts and quality crews working two or three shifts, turbine blade replacement can take a number of weeks —during which time the gas turbine is not operating (and therefore not generating electricity or money).  Power plants schedule outages based on the estimated inspection and repair schedule to ensure that they can plan for all necessary repairs and minimize the impact on their business.

61.   A turbine blade break is an even more serious event. It requires an unexpected plant shutdown to replace the blade.  And, if an S1B breaks, the remnants will impact and damage Stage 2 and Stage 3 of the turbine, breaking

additional blades and causing serious damage along the way that is time-consuming and expensive to repair, also introducing vibration induced damage to many other components of the powertrain.

62.   In January of 2015, a liberation event similar to the Incident occurred at the Power Plaint, in Power Train 1.

63.   The blade at issue broke after being run for approximately 22,000 hours, even though Defendants represented the blade would not require servicing until after 25,000 hours of use.

64.   The particular blades involved in that liberation event were GEN0 S1Bs.

65.   By way of background, the GEN0 S1Bs did not contain any internal aluminide coating (unlike the predecessor GENX S1Bs, which did contain such a coating), and their manufacture involved the use of a heat treatment process known as "Heat Treatment B" (whereas the GENX S1Bs had utilized a process known as "Heat Treatment A").

66.   Following this liberation event, GE International began producing the GEN1 S1Bs, which, like the GENX S1Bs (but unlike the predecessor GEN0 S1Bs) contained an internal aluminide coating.

67.    Additionally, GE Power Engineering, on behalf of itself, and GE International, issued Technical Information Letter 1987 ("TIL 1987") on March 31, 2016, which was revised on April 16, 2018.

68.    In the initial TIL 1987, Defendants stated that the liberation event was a result of cracking caused by oxidation that would not have happened if the S1B was internally coated:

> In 2015, a 9FB unit experienced a forced outage caused by S1B liberation after 23 thousand hours of operation. . . The S1B distress initiated from the internal cooling passage of the bucket[1] shank. . . A GE investigation has found that this cracking was caused by a special form of oxidation that affects the 9FB S1B material under certain conditions of stress and temperature. Some configurations of 9FB S1B have an oxidation resistant aluminide coating applied to the internal cooling passages of the bucket.  The presence of this coating protects the buckets from this special form of oxidation.

69.    Consequently, Defendants recommended that "S1Bs without internal aluminide coating be replaced prior to reaching 16,000 fired hours of operation," and stated that customers could contact their GE representative to have any currently uncoated S1Bs internally coated.

70.    In revision 1 of TIL 1987 however, Defendants stated that this corrective action was ineffective; advising that "recent inspection of parts with the coating have shown that the coating may not be effective in preventing crack initiation."

---

[1] "Bucket" is a GE term for the turbine blades.

71.    Thus, revision 1 of TIL 1987, as revised, indicated that all S1Bs, regardless of whether they were internally coated or not, should be replaced after being run for no more than 16,000 hours.

72.    Within the months following the initial issuance and revision 1 of TIL 1987, two similar S1B liberation events occurred in Turkey and Poland where the S1Bs were operated for approximately 15,000 hours.

73.    After the failures in Turkey and Poland, GE Power Engineering, again, on behalf of itself and GE International, on September 18, 2018, issued revision 2 of TIL 1987, which recommended replacement of the S1Bs by no later than 12,000 hours of usage.

74.    Plaintiffs are aware of other potentially similar (if not identical) failures, including one that occurred in Texas at the Exelon power plant in or around September 2018.

75.    At this juncture, Defendants' shortcomings with respect to the S1Bs and gas turbines were more than well known; for example, a December 7, 2018 Reuters article, which was based on "more than a dozen interviews with plant operators and industry experts," states that at least 18 of Defendants' gas turbines were being shut down for repairs, and that "GE is setting aside $480 million

to repair its 9HA, 7HA and 9FB model turbines as it restructures its power business."[2]

76.    Subsequently, in August 2019, another S1B liberation event occurred in China after just 9,800 hours of operation.

## III.    **The Incident**

77.    On September 4, 2019, SNC received a letter from GE Power, stating that Power Train 3 was at risk, having been operated at that point for 9,000 fired hours.

78.    GE Power stated that a planned outage of Power Train 3—which was initially scheduled for January 2020--should be moved earlier, to October 14, 2019, so that the GEN1 S1Bs therein could be replaced with GEN2 S1Bs, which according to GE Power "have corrective actions applied to them that are intended to mitigate the risk of shank distress and the potential for a S1B liberation event."

79.    It is unclear what, precisely, those "corrective actions" were; all that is known is that Defendants introduced a third heat treatment process (known as

---

[2] Reuters, *Exclusive: GE's Push To Fix Power Turbine Problem Goes Global*, Dec. 7, 2018, available at https://www.reuters.com/article/us-ge-power-exclusive/exclusive-ges-push-to-fix-power-turbine-problem-goes-global-idUSKBN1O60F4.

Heat Treatment A') and made some change to the internal aluminide coating that is not fully known to the Plaintiffs.

80.    In any event, SNC duly complied with the instructions received from GE Power and arranged, together with SKH and the local electricity grid, to proceed with a planned shutdown of Power Train 3 on or around October 14, 2019.

81.    The liberation event at issue in this litigation occurred while the scheduled shutdown was taking place.   Specifically, while Power Train 3 was decreasing in load for the scheduled shutdown, it tripped at about 320MW on excessive vibration and high exhaust temperature.

82.    A subsequent inspection of Power Train 3 revealed the following damage therein:

(a)    Extensive damage to all blades in Stage 1, Stage 2 and Stage 3 of the hot gas path of the turbine;

(b)    Extensive damage to the nozzles and vanes of Stage 1, Stage 2 and Stage 3 of the hot gas path of the turbine;

(c)    Significant damage to the compressor vanes and blades of the 19 stages compressor section;

(d)    Impact damage to the heat exchange tubes of the HRSG;

(e)    Damage to the rotor of the GE450H generator.

83.    An inspection and investigation of the October 14, 2019, liberation event suggests that it was caused by the same defect that resulted in the prior liberation events (*i.e.*, cracking in the S1Bs), which is believed to be the result of

18

oxidation-induced cracking, which may be caused by issues in the heat treatment process, and issues with the internal aluminide coating.

84.     Almost immediately after the Incident, on October 31, 2019, GE Power Engineering issued revision 3 to TIL 1987, indicating that S1Bs should be replaced by no later than 9,000 fired hours.

85.     It is Plaintiffs' understanding that failures similar to those involved in the liberation event are still continuing around the globe.

## IV.     **Damages**

86.     As a result of the Incident, Plaintiffs (as SKH's subrogees) have been damaged in the amount of no less than $28 million, representing costs in connection with the repair and replacement of the damaged parts and equipment in Power Train 3, as well as business interruption losses.

87.     It is anticipated that further payments will be made in this regard, and that this damages figure will increase in an amount to be determined at trial.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS (Negligence)

88.     Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

89.     Defendants, collectively or individually, owed a legal duty to SKH, the owner of the Power Plant, to exercise reasonable care in the design, manufacture, installation, and/or servicing of the gas turbines and S1Bs.

90.   Defendants knew, or should have known, that SKH would rely on the Defendants' services in this regard, as well as their advice concerning the operation of the gas turbines and S1Bs, including but not limited to the number of hours the equipment could be run at before a risk of failure would materialize.

91.   Defendants breached their duty of care to the Plaintiffs by, *inter alia*, (i) installing GEN1 S1Bs in Power Train 3 in or around April 2018, when such blades were being phased out due to recurring issues with their performance; (ii) failing to properly design and manufacture the S1Bs such that they would be suitable for their intended purpose; (iii) failing to accurately calculate the appropriate number of hours at which the S1Bs could safely be operated before being replaced; and (iv) failing to take reasonable corrective actions after issues began arising with the S1Bs, and instead permitting the S1Bs to run to a point where they failed.

92.   Defendants' breach of their duty of care to the Plaintiffs legally and proximately caused significant losses to Plaintiffs (as SKH's subrogees).

93.   As a result of the Defendants' negligence, Plaintiffs were caused to sustain significant business interruption losses and property damages, in amount no less than $28 million.

94.   Plaintiffs are therefore entitled to recover such sums from Defendants for their negligence.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Gross Negligence)

95.    Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

96.    Defendants, collectively or individually, owed a legal duty to SKH, the owner of the Power Plant, to exercise reasonable care in the design, manufacture, installation, and/or servicing of the gas turbines and S1Bs.

97.    Defendants knew, or should have known, that SKH would rely on the Defendants' services in this regard, as well as their advice concerning the operation of the gas turbines and S1Bs, including but not limited to the amount of hours the equipment could be run at before a risk of failure would materialize.

98.    Defendants breached their duty of care to the Plaintiffs by, *inter alia*, (i) installing GEN1 S1Bs in Power Train 3 in or around April 2018, when such blades were being phased out due to recurring issues with their performance; (ii) failing to properly design and manufacture the S1Bs such that they would be suitable for their intended purpose; (iii) failing to accurately calculate the appropriate number of hours at which the S1Bs could safely be operated before being replaced; and (iv) failing to take reasonable corrective actions after issues began arising with the S1Bs, and instead permitting the S1Bs to run to a point where they failed.

99.     These failures were so wanton, careless and/or reckless so as to constitute acts of gross negligence.

100.    Defendants' breach of their duty of care to the Plaintiffs legally and proximately caused significant losses to Plaintiffs (as SKH's subrogees).

101.    As a result of the Defendants' gross negligence, Plaintiffs were caused to sustain significant business interruption losses and property damages, totaling no less than $28 million.

102.    Plaintiffs are therefore entitled to recover such sums from Defendants for their negligence.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Strict Products Liability)

103.    Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

104.    In light of the defects with the S1Bs, Plaintiffs are entitled to recover against Defendants on a theory of strict products liability.

105.    While investigation of the Incident remains ongoing, it is believed that the S1Bs contained a design and/or manufacturing defect, to wit, a crack-like defect in the blade shank introduced at the casting, and/or heat treatment stage, or cracking of the internal coating in the blade shank.

106.   Upon information and belief, the same design and/or manufacturing defect caused the prior S1B liberation events preceding the Incident.

107.   It is believed that other, further design and/or manufacturing defects will be uncovered during the course of fact and expert discovery.

108.   In addition to the above-referenced design and/or manufacturing defect, the S1B's contained inadequate warnings and/or advertisements relating to their use.

109.   At or prior to the time the Incident occurred, it was represented to SKH that the S1Bs could safely be operated up to 9,985 hours without fear of failure.

110.   It is now clear that they could not, and as is evident from the fact that there had recently been a S1B liberation in China at approximately 9,800 hours, and as indicated by the TIL 1987 revision issued almost immediately after the Incident, the S1Bs should not have been operated in excess of 9,000 hours.

111.   The design and manufacturing defects present in the S1Bs, and the inadequate warnings and/or advertisements, directly and proximately caused the Incident, resulting in significant losses to Plaintiffs (as SKH's subrogees).

112.   Specifically, Plaintiffs were caused to sustain significant business interruption losses and property damages, in amount no less than $28 million, and Defendants are strictly liable to Plaintiffs for this sum.

## <u>AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>
### (Breach of the Warranty of Merchantability)

113. Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

114. Defendants made express and/or implied warranties to SKH in connection with the gas turbines and S1Bs that such components would be suitable for their intended purpose and reasonably free from defects.

115. Defendants breached these warranties by furnishing defective products to SKH that were not suitable for their intended purpose.

116. The GEN1 S1Bs utilized in Power Train 3 were prone to cracking issues and liberation events.

117. The Incident resulted due to defects in the S1Bs (*i.e.*, the cracking issues) which ultimately caused a liberation event.

118. All of the foregoing constitutes a breach of Defendants' implied and/or express warranties with respect to the gas turbines and S1Bs.

119. As a result of Defendants' breach of the implied and/or express warranties, Plaintiffs were caused to sustain significant business interruption losses and property damages, in amount no less than $28 million, and Defendants are liable to Plaintiffs for this sum.

## <u>AS AND FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>
### (Negligent and/or Fraudulent Misrepresentations)

120.   Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

121.   Defendants made representations to SKH concerning the performance and capabilities of the S1Bs.

122.   Defendants knew, or reasonably should have known, that SKH would rely on such representations in deciding whether to procure and utilize the S1Bs at the Power Plant.

123.   Defendants knew, or reasonably should have known, that their representations concerning the performance and capabilities of the S1Bs were untrue at the time they were made.

124.   SKH justifiably relied on the representations made by Defendants concerning the performance and capabilities of the S1Bs and procured and utilized the S1Bs at the Power Plant.

125.   On October 14, 2019, SKH suffered significant business interruption losses and property damages, when a S1B in Train 3 failed.

126.   Had Defendants been forthcoming about the true capabilities of the S1Bs, SKH would not have allowed them to operate for as long they did.

127.  As a result of Defendants' negligent and/or fraudulent misrepresentations, Plaintiffs were caused to sustain significant business interruption losses and property damages, inamount no less than $28 million, and Defendants are liable to Plaintiffs for this sum.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Violation of Algerian Civil Code Article 124)

128.  Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

129.  Article 124 of the Algerian Civil Code provides that "[a]ny action by one person causing loss to another person shall require the person whose fault generated said loss, to compensate said loss."

130.  Defendants, collectively or individually, owed a legal duty to SKH, the owner of the Power Plant, to exercise reasonable care in the design, manufacture, installation, and/or servicing of the gas turbines and S1Bs.

131.  Defendants knew, or should have known, that SKH would rely on the Defendants' services in this regard, as well as their advice concerning the operation of the gas turbines and S1Bs, including but not limited to the number of hours the equipment could be run at before a risk of failure would materialize.

132.  Defendants breached their duty of care to the Plaintiffs by, *inter alia*, (i) installing GEN1 S1Bs in Power Train 3 in or around April 2018, when such

blades were being phased out due to recurring issues with their performance; (ii) failing to properly design and manufacture the S1Bs such that they would be suitable for their intended purpose; (iii) failing to accurately calculate the appropriate number of hours at which the S1Bs could safely be operated before being replaced; and (iv) failing to take reasonable corrective actions after issues began arising with the S1Bs, and instead permitting the S1Bs to run to a point where they failed.

133. Defendants' breach of their duty of care to the Plaintiffs legally and proximately caused significant losses to Plaintiffs (as SKH's subrogees).

134. The aforesaid conduct plainly constitutes a violation of Article 124 of the Algerian Civil Code.

135. As a result of the Defendants' statutory violation, Plaintiffs were caused to sustain significant business interruption losses and property damages, in amount no less than $28 million.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Violation of Algerian Civil Code Article 140 Bis)

136. Plaintiffs repeat, reiterate, and reallege all of the allegations contained in the preceding paragraphs as if stated more fully herein.

137.   Article 140 Bis of the Algerian Civil Code provides that "[t]he manufacturer shall be responsible for loss due to defects in the product, even in the absence of any contractual relationship with the victim."

138.   One or more of the Defendants were involved in the manufacture of the gas turbines and/or S1Bs, which contained serious defects.

139.   While investigations of the Incident remain ongoing, it is believed that the S1Bs contained a manufacturing defect, to wit, a crack-like defect in the blade shank introduced at the casting, and/or heat treatment stage, or cracking of the internal coating in the blade shank.

140.   Upon information and belief, the same manufacturing defect likely caused the prior S1B liberation events preceding the Incident.

141.   It is believed that other, further manufacturing defects will be uncovered during the course of fact and expert discovery.

142.   The manufacuring defects present in the S1Bs, directly and proximately caused the Incident, resulting in significant losses to Plaintiffs (as SKH's subrogees).

143.   Specifically, Plaintiffs were caused to sustain significant business interruption losses and property damages, in amount no less than $28 million.

144.   The aforesaid conduct constitutes a violation of Article 140 Bis of the Algerian Civil Code, and Plaintiffs are therefore entitled to recover for their losses against Defendants.

**WHEREFORE**, Plaintiffs request a jury trial and demand judgment as against the Defendants, as follows:

A.   A money judgment in an amount no less than $28 million on Plaintiffs First through Seventh causes of action;

B.   A money judgment to the Plaintiffs in an amount to be determined as compensation for the costs and disbursements of this action; and

C.   Such other and further relief as this Court may deem just, proper and  equitable, including interest, costs and attorneys' fees, plus interest.

D.   Equitable relief, including but not limited to a declaration that Defendants are in violation of their respective contractual duties, and/or restitution for any sums by which Defendants have been unjustly enriched.

This 14th day of October 2021.

**FIELDS HOWELL LLP**
1180 West Peachtree St, Suite 1600
Atlanta, Georgia 30309
404.214.1274 (Telephone)
404.214.1251 (Facsimile)
jkramer@fieldshowell.com

_/s/ Jonathan D, Kramer_
Jonathan D. Kramer
Georgia Bar No.: 428967

_Counsel for Plaintiffs_

**KENNEDYS CMK LLC**
570 Lexington Avenue
New York, New York 10011
212.252.0004 (Telephone)
Christopher.Carroll@kennedylaw.com
Michael.Tricarico@kennedylaw.com
Thomas.Kaufman@kennedylaw.com

Christopher R. Carroll, Esq.
New York Bar No. 2462505
*Pro Hac Vice Forthcoming*
Michael J. Tricarico, Esq.
New York Bar No. 2466878
*Pro Hac Vice Forthcoming*
Thomas C. Kaufman, Esq.
New York Bar No. 5693528
*Pro Hac Vice Forthcoming*

*Counsel for Plaintiffs*